IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Donnie Ray Hamm, | ) | Civil Action No. 8:12-cv-1268-GRA-JDA |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Carolyn W. Colvin,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(a), D.S.C. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of Defendant Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB"). For the reasons set forth below, it is recommended that the decision of the Commissioner be reversed and remanded for an award of benefits.

**PROCEDURAL HISTORY**

In October 2005, Plaintiff filed an application for DIB, alleging an onset of disability date of March 20, 2003. [R. 117–26.] The claim was denied initially and on reconsideration by the Social Security Administration ("the Administration"). [R. 98–108.] On August 25, 2006, Plaintiff requested a hearing before an administrative law judge ("ALJ") [R. 110], and on October 24, 2008, ALJ Ivar E. Avots conducted a de novo hearing on Plaintiff's claim [R. 37–97]. The ALJ issued a decision on March 2, 2009, finding that,

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

pursuant to the Social Security Act ("the Act"), Plaintiff had not been under a disability from the alleged onset date through the date of the ALJ's decision. [R. 13–20.] Specifically, the ALJ found Plaintiff had severe impairments including disorders of the lumbar spine, headaches, and a cognitive disorder. [R. 15.] Further, the ALJ determined Plaintiff retained the following residual functional capacity ("RFC"):

> I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c). The claimant can lift 50 pounds occasionally and 25 pounds frequently. He can sit for about six of eight hours, and stand/walk for six hours in an eight hour day. The claimant is limited to no more than occasional climbing of ramps or stairs. He is precluded from climbing ropes, ladders and scaffolds. He can frequently perform all other postural activities. The claimant should avoid concentrated exposure to fumes and gases. He is limited to simple, routine, repetitive tasks in two hour intervals. He can interact with the public occasionally. The claimant can sustain a work routine, and exhibit socially appropriate work behavior. He does not have visual, communicative, or manipulative limitations.

[R. 16.] Based on this RFC assessment, the ALJ determined there were jobs existing in significant numbers in the national economy that Plaintiff could perform. [R. 19.]

Plaintiff requested Appeals Council review of the ALJ's decision [R. 6–9], but the Appeals Council declined review [R. 1–4]. Plaintiff filed an action in federal court, seeking judicial review of the ALJ's March 2009 decision, and in September 2010, United States Magistrate Judge Robert S. Carr issued an order remanding the case to the Commissioner. [R. 489–500.] In its order, the court held (1) contrary to *Mickles v. Shalala*, 29 F.3d 918 (4th Cir. 1994), the ALJ improperly dismissed Plaintiff's allegations as to the severity and persistence of his pain because Plaintiff's allegations were not corroborated by objective evidence of pain; and (2) contrary to the standards required for evaluation of medical

2

evidence, the ALJ failed to evaluate the functional limitations found by Plaintiff's physicians, Drs. Schwartz, Kopera and Baxley. [R. 497–99.] Consequently, the court reversed and remanded the decision for a full and fair evaluation of Plaintiff's entitlement to benefits during the period of March 20, 2003, the alleged onset date, to March 2, 2009, the date of the ALJ's decision.[2] [R. 499–500.]

On May 17, 2011, a second hearing was held before the ALJ. [R. 501–23; Supp. R. 1–44.] On September 21, 2011, the ALJ again found Plaintiff was not disabled from March 20, 2003, his alleged onset date, through March 2, 2009, the date after which a subsequent favorable decision found Plaintiff disabled. [R. 461–79.] At Step 1,[3] the ALJ found Plaintiff met the insured status requirements through March 31, 2009 and had not engaged in substantial gainful activity from March 20, 2003 through March 2, 2009. [R. 463, Findings 1 & 2]. At Step 2, the ALJ found Plaintiff had the following severe combination of impairments: disorders of the spine, cognitive disorder, asthma, and learning disability. [R. 463, Finding 3.] The ALJ also found Plaintiff's headaches, left upper extremity ulnar neuropathy, and right upper extremity carpal tunnel were not severe impairments. [R. 468–69.] At Step 3, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 469, Finding 4.]

---

[2]In March 2009, after the ALJ's decision denying benefits, Plaintiff filed a second DIB application, and on June 17, 2010, ALJ Alice Jordan awarded Plaintiff benefits as of March 3, 2009, the day after ALJ Avots's original decision. [R. 547–52.] Therefore, the issue before the court was whether Plaintiff was disabled during the period between March 20, 2003, his alleged onset date in the application before the court, and March 2, 2009, the date of the ALJ's decision before the court. [R. 496.]

[3]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

Before addressing Step 4, Plaintiff's ability to perform his past relevant work, the ALJ found Plaintiff retained the following RFC:

> I find that, through March 2, 2009, the claimant had the residual functional capacity to perform a wide range of medium work as defined in 20 CFR 404.1567(c). I find claimant could frequently lift or carry 25 pounds, occasionally lift or carry 50 pounds, sit for 6 hours of an 8 hour workday, and stand or walk for 6 hours of an 8 hour workday. I also find [the claimant] could never climb ladders, ropes, and scaffolds, occasionally climb ramps and stairs, and frequently stoop, kneel, crouch, crawl, and balance. I further find claimant should avoid concentrated exposure to fumes, odors, gases, and poor ventilation. I additionally find claimant [could] concentrate, persist and work at pace to do simple, routine, repetitive tasks at level 3 reasoning per the Dictionary of Occupational Titles for 2 hour periods in an 8-hour day, interact occasionally with the public, and interact appropriately with co-workers and supervisors in a stable, routine setting.

[R. 470, Finding 5.] Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform his past relevant work [R. 478, Finding 6]; however, at Step 5, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform [R. 478, Finding 10]. On this basis, the ALJ found Plaintiff had not been under a disability, as defined by the Act, from March 20, 2003 through March 2, 2009. [R. 479, Finding 11.]

Plaintiff requested Appeals Council review of the ALJ's decision [R. 429–35], but the Appeals Council declined review [R. 426–28]. Plaintiff filed the present action for judicial review on May 14, 2012. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ, for a second time, improperly required Plaintiff to corroborate his subjective complaints of pain with objective medical evidence, in

4

contradiction of the law in the Fourth Circuit. [Doc. 23 at 6.] Plaintiff contends the ALJ's "decision on appeal is just as inconsistent with the Law as his previous decision albeit more 'thinly veiled' than the former decision." [*Id.* at 7.] Plaintiff also argues the ALJ improperly evaluated the opinions of Plaintiff's primary treating physicians: Dr. G. Timothy Baxley, a board certified neurologist; Dr. Robert G. Schwartz, a pain management specialist; and Dr. Eric Loudermilk, a pain management specialist. [*Id.* at 9–13; *see also* Doc. 26 (Plaintiff's reply brief).] Specifically, Plaintiff points out that, in the ALJ's March 2009 decision, the ALJ found Plaintiff's headaches were a severe impairment, but in the ALJ's May 2011 decision, he found Plaintiff's headaches were a non-severe impairment and appeared to use that finding to discredit the opinions of Drs. Baxley and Schwartz to the extent those opinions were based on Plaintiff's headache complaints. [Doc. 23 at 10, 11; Doc. 26 at 2.] Additionally, Plaintiff contends the ALJ cherry-picked medical evidence to come up with reasons for finding Plaintiff's testimony regarding his limitations was not credible, and the ALJ improperly supported his decision with the opinions of non-examining and non-treating physicians and a functional capacity evaluation completed at the request of Plaintiff's former employer's Workers' Compensation insurance carrier. [Doc. 23 at 7–9, 13.]

The Commissioner, on the other hand, contends the ALJ reasonably weighed the medical opinions and evidence, including the opinions of the treating physicians. [Doc. 25 at 16–22.] The Commissioner also argues the ALJ reasonably found Plaintiff's subjective complaints of disabling limitations to be incredible. [*Id.* at 22–24.] Additionally, the Commissioner contends that, even if the ALJ erred in finding Plaintiff's headaches were not a severe impairment, the error was harmless because the combined effect of all

5

impairments—severe and non-severe—must be taken into consideration at subsequent steps of the sequential evaluation.  [*Id.* at 14–16.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963))("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also  Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the

Commissioner's decision). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was

7

appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled).  Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four may be appropriate to allow the Commissioner to explain the basis for the decision.  *See Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand.").  After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction.  *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g).  A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is

8

material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4] With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98. The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

---

[4] Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence. *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992). Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990). Accordingly, the Court will apply the more stringent *Borders* inquiry.

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.     The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims).  The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.  20 C.F.R. § 404.1520.  Through the fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day of her insured status to receive disability benefits.  *Everett v. Sec'y of Health, Educ. &*

*Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 404.1572(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 404.1572(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* § 404.1521. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the

11

[Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. § 423(d)(2)(B).

**C.      *Meets or Equals an Impairment Listed in the Listings of Impairments***

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 404.1509, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(d).

**D.      *Past Relevant Work***

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[5] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work. 20 C.F.R. § 404.1560(b).

---

[5]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a).

12

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); 20 C.F.R. § 404.1520(f)–(g).   To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").   Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[6]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *see also Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).   When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931. In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.   20 C.F.R. § 404.1569a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform

---

[6] An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. § 404.1569a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.*  Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. § 404.1569a(c)(1).

specific jobs which exist in the national economy."). The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker*, 889 F.2d at 50. For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.* (citations omitted).

## II.     Developing the Record

The ALJ has a duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ is required to inquire fully into each relevant issue. *Snyder*, 307 F.2d at 520. The performance of this duty is particularly important when a claimant appears without counsel. *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980). In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

## III.     Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The ALJ may discount a treating physician's opinion if it is

14

unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. § 404.1527(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 404.1527(c)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. § 404.1527(d).  However, the ALJ is responsible for

15

making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 404.1517; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. § 404.1517. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the

ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990). The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable

> objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. § 404.1529(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record. Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria. *Breeden*,

493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## MEDICAL HISTORY

In March 2003, Plaintiff was in a motor vehicle accident at work when a car lost control in front of him and spun into the front driver's side of his vehicle.  [R. 237, 253.] Plaintiff suffered broken ribs and complained of pain in his lower back and the posterior aspect of his left hip that radiated anteriorly into the left hip and was worse with weight-bearing and ambulation.  [R. 254.]  Plaintiff also complained of pain radiating down the posterior aspect of the thigh into the lateral calf and foot, left leg numbness, mild thoracic pain, and inferior left periscapular pain.  [R. 255.]  An MRI performed May 14, 2003 showed mild degenerative disk disease and disk bulging circumferentially at L4-5 with mild to moderate facet joint degenerative changes; small central disk protrusions at L5-S1 with slight accentuation to the left but no apparent nerve root compression; and small oblique linear defect at the anterior superior L5 vertebral body region.  [R. 230–31.]   A chart note from May 21, 2003 stated the MRI revealed spondylosis at the 4-5 and 5-1 levels with central to left sided disk herniation with slight nerve root impingement on the left and conjoint nerve root appreciated on the right.  [R. 256.]

### *Dr. Kopera's Treatment and Opinions*

Plaintiff was seen by Dr. Kevin W. Kopera for an outpatient evaluation on August 7, 2003.  [R. 296–97.]  Plaintiff reported his pain was 10 on a scale of 0 to 10, but Dr.

19

Kopera noted that, outwardly, Plaintiff did not appear to be in pain to that degree. [R. 297.] On examination, Plaintiff had discomfort with palpation (1) over the lower thoracic spine extending throughout the lumbar spine at all levels and into the sacrum and (2) over the paraspinal musculature at the same levels, especially on the left side. [*Id.*] Dr. Kopera also noted that Plaintiff

> was able to flex forward at the waist about 45 degrees before he was limited by pain. Lumbar extension could be performed normally and pain free. Lateral bending in each direction was slightly limited and caused some localized discomfort. . . . Muscle strength was clearly normal throughout the right lower extremity while muscle strength testing in the left lower extremity was limited by low back pain and there was questionable weakness in the left lower extremity but strength was at least in the 4/5 range. The left straight leg raise intensified pain in the left lower back area but did not produce radicular symptoms while the right straight leg raise test was negative. [Plaintiff] ambulated with a significant limp favoring his left side, although balance and coordination appeared to be normal.

[*Id.*] Dr. Kopera directed Plaintiff to physical therapy and wanted to reassess his progress after two weeks. [*Id.*] In the interim, Dr. Kopera encouraged Plaintiff to increase activities such as walking. [*Id.*] Dr. Kopera returned Plaintiff to work but with restrictions of a maximum lift, push, and pull of ten pounds with alternating sitting and standing and noted that it was concerning that Plaintiff's recovery had been delayed and his pain focus remained quite high. [*Id.*] Dr. Kopera indicated he was cautiously optimistic that Plaintiff would return to regular job duties in four to six weeks. [*Id.*]

On August 28, 2003, Plaintiff returned to Dr. Kopera for a follow-up visit with continued complaints of low back pain and increased pain behavior. [R. 298.] Plaintiff reported more symptoms involving the left lower extremity and that his left leg was giving

20

out; he also ambulated flexed forward at the waist. [*Id.*] Dr. Kopera indicated that Plaintiff's symptoms were out of proportion to the objective findings as he was grossly neurologically intact, but "[p]ressure applied to the lower thoracic and lumbar spine at all levels seem[ed] to produce pain with dramatic pain response as d[id] palpation over the soft tissues in the left lower thoracic and lumbar regions." [*Id.*] Dr. Kopera was disappointed in Plaintiff's response to physical therapy and recommended testing to further explore why Plaintiff was doing so poorly. [*Id.*] Dr. Kopera also maintained work restrictions of ten pounds maximum in lifting, pushing, and pulling. [*Id.*]

On October 1, 2003, Dr. Kopera reviewed a bone scan and a nerve conduction study, which both demonstrated normal results and offered no explanation of Plaintiff's symptoms. [R. 299.] Dr. Kopera concluded that he was limited in what he could offer Plaintiff and released him from his care, assessing Plaintiff with a 5% impairment to the spine. [*Id.*] Dr. Kopera noted it was "difficult to say what [Plaintiff] [wa]s capable of performing in terms of capabilities. From an objective standpoint, he should be able to resume his regular activities[;] however, his current level of symptoms seem to restrict him from doing heavy lifting (greater than 50 lbs)." [*Id.*]

Despite being released from Dr. Kopera's care, Plaintiff returned to Dr. Kopera in December 2003. [R. 301.] Dr. Kopera found his opinion was unchanged, and he also opined that, in his experience, "in cases such a[s] [Plaintiff's] when diagnostic testing is largely unremarkable and non-physiological findings are present they typically do not respond to pain management." [*Id.*] Dr. Kopera noted Plaintiff had the same restrictions

21

as Dr. Kopera assessed in October 2003—maximum lift of 50 pounds—and that Dr. Kopera had nothing further to offer Plaintiff.  [*Id.*]

### Dr. Schwartz's Treatment and Opinions

Plaintiff was seen by Dr. Robert G. Schwartz on January 19, 2004, with a chief complaint of thoracolumbar pain that radiated to his left lower extremity.  [R. 237.]  Plaintiff also reported that he injured his left shoulder in his March 2003 accident and the shoulder improved, but when he returned to work in October 2003, "his shoulder pain started to re-exacerbate."  [*Id.*]  Plaintiff was unsure whether he had experienced a concussion but did not remember all the events surrounding his accident and had had decreased memory since the accident.  [*Id.*]  Dr. Schwartz noted Plaintiff did seem to have difficulty with memory and concentration.  [*Id.*]  On examination, there was no evidence of misalignment, asymmetry, crepitation, defects, tenderness, or effusions in the peripheral joints; coordination, gait, and station were normal; peripheral pulses were intact; and there was no evidence of ulceration or trophic change.  [*Id.*]  Dr. Schwartz also noted Plaintiff's reflexes were symmetric and that Plaintiff had 5/5 motor strength; decreased sensation to pinprick in the lower left extremity subjectively; negative Phalen's, Tinel's, and Spurling's tests; palpable spasm at C5/6 and T5/6 on the right; a decreased lordosis; intact heel and toe walking; negative straight leg raising, reverse straight leg raising, bowstring, Bragard's and Fabere's; a positive SI stretch test on the left; and tenderness at the L5/S1 facet and SI joint.  [R. 238.]  Dr. Schwartz's impression was apparent left L5/S1 facet syndrome versus sacral strain, probable left C5/6 facet syndrome with T5/6 MFS, small left L5/S1 HNP, and possible mild traumatic brain injury.  [*Id.*]  Because of the possible brain injury,

22

Dr. Schwartz was not comfortable with Plaintiff working as a long-distance truck driver and excused Plaintiff from work, but he did not think Plaintiff was at maximum medical improvement.  [R. 236, 238; *see also* R. 286 (March 2004 questionnaire completed by Dr. Schwartz).]    At a return visit on January 23, 2004, Dr. Schwartz noted Minnesota Multiphasic Personality Inventory ("MMPI") testing showed an unusual scale pattern with a possible schizo-typical personality disorder.  [R. 232.]  Dr. Schwartz administered a lumbar facet region block.  [*Id.*]

Plaintiff returned to Dr. Schwartz in January 2005.  [*Id.*]  He came into the appointment using a cane, and Dr. Schwartz noted Plaintiff "still ha[d] quite a bit of pain behavior."  [*Id.*]  On examination, Plaintiff was essentially the same as on January 19, 2004, but he also had a positive reverse straight leg raise on the left.  [*Id.*]  Dr. Schwartz's impression was that Plaintiff had "an ongoing post-concussive headache as well as left sacral strain, with a small L5/S1 HNP."  [*Id.*]  Dr. Schwartz assessed that Plaintiff had sustained an 8% impairment to his lumbar spine and a 5% impairment to the head/brain.  [*Id.*; *see also* R. 288–89 (Dr. Schwartz's January 2005 questionnaire responses).]  Dr. Schwartz completed two questionnaire forms within the week following Plaintiff's appointment and indicated Plaintiff was limited to lifting no more than ten pounds and no prolonged driving.  [R. 287–89.]

In March 2005, Dr. Schwartz completed a clinical assessment of pain form and indicated the following with respect to Plaintiff's condition:

1.    Plaintiff's pain is present to such an extent as to be distracting to adequate performance of daily activities or work;

2.      Physical activities such as walking, standing, bending, stooping, moving of extremities, etc., will greatly increase Plaintiff's pain to such a degree as to cause distraction from the task or even total abandonment of the task;

3.      Some side effects can be expected from Plaintiff's prescribed medications but will be only mildly troublesome;

4.      In his best judgment, pain and/or drug side effects can be expected to be severe and to limit Plaintiff's effectiveness due to distraction, inattentiveness, drowsiness, etc.;

5.      Although the level of Plaintiff's pain may be less intense or less frequent in the future, it will still remain a significant element in his life.

[R. 292–93.]

### Dr. Baxley's Treatment and Opinions

On May 10, 2004, Dr. Timothy Baxley saw Plaintiff for a neurologic evaluation on referral from his primary care physician, Dr. Maria Cayelli.  [R. 332.]  After a physical examination where Plaintiff exhibited pain and some limitations, Dr. Baxley assessed (1) post-concussive syndrome for memory loss; (2) vascular-type headaches over the left hemicrania; and (3) mechanical-type low back pain with what appeared to be a lumbar radiculopathy affecting the left lower extremity. [R. 333.] On July 15, 2004, after reviewing Plaintiff's lumbar spine MRI and conducting a physical examination, Dr. Baxley assessed Plaintiff with (1) persistent post-traumatic headaches; (2) mechanical back pain with lumbar radiculopathy/discopathy; and (3) dyscoordination with fine movement of the left upper extremity. [R. 330.]  Dr. Baxley prescribed medications and a handicap sticker.  [*Id.*]

On August 12, 2004, Plaintiff returned to Dr. Baxley complaining of left temporal headache, some memory disturbance, and continued low back pain in the midline as well as a left-sided lumbar predominance.  [R. 328.]  Dr. Baxley noted that the EMG nerve conduction study by Dr. Schwartz "showed left ulnar neuropathy at the elbow and right

carpal tunnel syndrome as well as what is described a peripheral neuropathy" and that

several other tests were normal.  [*Id.*]  Dr. Baxley assessed mechanical low back pain,

post-traumatic headaches, and post-concussive syndrome with cognitive difficulties. [*Id.*]

Dr. Baxley prescribed medications; administered injections at the L2, L4, and S1 paraspinal

regions bilaterally; and suggested that Plaintiff may need neuropsychological evaluation

of his post-concussive memory deficit.  [R. 328–29.]

> In a letter to Plaintiff's attorney dated August 26, 2004, Dr. Baxley stated,

> > Regarding [Plaintiff's] condition, please be advised that his working diagnoses include mechanical low back pain, posttraumatic headaches, and post concussive syndrome with cognitive difficulties.  From a clinical as well as temporal onset standpoint, it would appear that these difficulties would date from the time of his accident.  Regarding maximum medical improvement, as of 8/12/04, it does not appear that [Plaintiff] is at maximum medical improvement.  I would not recommend that he resume driving a tractor-trailer at this point in time, as it could be dangerous for [Plaintiff] as well as other persons. I would also recommend that he not lift repetitively, and avoid high impact exercise/activities of daily living.  In addition, I would not recommend that he engage in employment where he is required to use advanced cognitive skills, until such time as he is significantly improved back towards his baseline. Along those lines, I would strongly recommend that [Plaintiff] have a neuropsychological evaluation.

[R. 327.]

> On September 22, 2004, Plaintiff indicated to Dr. Baxley that the medication for his

headaches tended to help, especially if he took the medicine immediately at the onset of

a headache.  [R. 325.]  Plaintiff also indicated that the injections had helped his back pain

for several days; Dr. Baxley repeated the injections.  [R. 325–26.]  On November 2, 2004,

Plaintiff reported that his back pain persisted at the L2-L3 region on the left and that his

headache persisted in the left temporal region, although his headache medication helped

some.  [R. 324.]  Dr. Baxley prescribed medications and repeated the injections in Plaintiff's back.  [*Id.*]  On December 28, 2004, Plaintiff reported his sleep was better on the new medication, and Dr. Baxley noted Plaintiff "intermittently ha[d] a pulsatile left temporal headache."  [R. 323.]

In February 2005, Dr. Baxley completed a questionnaire form and indicated he diagnosed Plaintiff with mechanical back pain and post-traumatic headaches.  [R. 290.] Dr. Baxley stated that he would not recommend that Plaintiff drive, second to "his tendency towards visual obscurations," and he would not recommend that Plaintiff lift over ten pounds, second to his mechanical back pain.  [*Id.*]  On March 3, 2005, Plaintiff reported he was doing better from a headache and sleep standpoint but that his low back pain had migrated downwards into the bilateral buttocks, and he had a tingling dysesthesia in the left lower extremity.  [R. 322.]  Dr. Baxley revised his assessment to (1) improved headache syndrome, posttraumatically, and (2) mechanical back pain.  [*Id.*]  On April 16, 2005, Plaintiff reported left-sided neck pain and left-sided cervicogenic headaches, as well as back pain in the T12 to L1 region.  [R. 321.]  Dr. Baxley assessed Plaintiff with mechanical pain and post-traumatic headaches, prescribed medications, and administered injections.  [*Id.*]  Dr. Baxley also encouraged Plaintiff to follow up with Dr. Schwartz for pain control.  [*Id.*]

On June 16, 2005, Dr. Baxley noted Plaintiff was doing somewhat better with respect to his headaches, specifically noting that Plaintiff's "visual scotoma now reliably occur just prior to his headaches, giving him [a] 40 to 50-minute warning."  [R. 320.]  Dr. Baxley's assessment was diffuse mechanical pain, sleep disturbance, and left temporal

migraine headaches with visual scotoma.  [*Id.*]  In August and October 2005, Dr. Baxley noted Plaintiff's headaches had improved, but he had ongoing low back pain, although medication had helped his back pain.  [R. 318–19.]

In February 2006, Dr. Baxley wrote a letter to the South Carolina Vocational Rehabilitation office.  [R. 343.]  Dr. Baxley indicated Plaintiff had "significant problems with mechanical back pain, posttraumatic headaches, and postconcussive syndrome."  [R. 343.] Dr. Baxley opined that Plaintiff had "ongoing legitimate pain concerns" and restrictions in his activities of daily living, and he "remain[ed] unfortunately significantly work impaired." [*Id.*]

On December 15, 2006, Dr. Baxley reviewed a new MRI and nerve conduction study.  [R. 418.]  Dr. Baxley noted, "Fortunately, the MRI of the L-spine has not shown changes in 3 1/2 years but [Plaintiff] does have clinical and radiographic edema confirmed clinically and on the MRI."  [*Id.*]  Dr. Baxley's impression was that the tests were consistent with a significant bilateral L4-L5 radioculopathy.  [*Id.*]  Dr. Baxley also noted Plaintiff's headaches seemed to have subsided somewhat, and he had not had another episode of loss of consciousness.  [*Id.*]

On February 26, 2007, Dr. Baxley observed Plaintiff was doing significantly better, although he had had a smoldering headache for the past five days; his low back pain seemed to be a little bit higher on the left side; and Plaintiff was taking Spiriva for breathing difficulties.  [R. 416.]  Dr. Baxley noted Plaintiff had some left thigh pain and myospasm, indicating some restless leg contribution.  [*Id.*]  In May 2007, Plaintiff reported low back pain and left neck pain, as well as weakness in the left upper extremity.  [R. 414.]  On

physical exam, Dr. Baxley noted Plaintiff's neck was tender and rigid, and he had diffuse trigger points for low back pain and myospasm. [*Id.*] In July 2007, Dr. Baxley noted Plaintiff's neck pain had improved after seeing Dr. Loudermilk,[7] his headaches occurred intermittently but responded to medication, and his left sciatic pain had worsened. [R. 412.] In September 2007, Plaintiff complained of worsening low back pain, mainly in the left buttock, left posterior thigh, and L5-S1 region. [R. 410.] On examination, Plaintiff showed tenderness over the left lumbosacral in the L4-L5 region, swelling over the L4-L5 region, and some tenderness over the left hemicranium. [*Id.*] In December 2007, Plaintiff reported that his headaches were starting to occur more frequently. [R. 408.] On examination, Dr. Baxley noted Plaintiff was "[t]ender over the left C5 paraspinal, tender over the left L5 paraspinal, trigger points and myospasm there, associated soft tissue swelling there." [*Id.*] Plaintiff presented with similar complaints in March 2008, and Dr. Baxley's assessment was practically unchanged with respect to Plaintiff's headaches and neck and back conditions. [R. 407.]

On May 8, 2008, Plaintiff reported worsening neck pain and low back pain exacerbated by ranges of motion, and examination revealed swelling and tenderness over the right C5 paraspinal, the left L5 paraspinal, and the right T12 paraspinal. [R. 377.] On July 24, 2008, Dr. Baxley noted Plaintiff had developed left-sided thoracic pain and myospasm, which had become severe and confined him to his bed, and on examination, Plaintiff had tenderness that appeared to be subluxed with the left T8 region rib head. [R. 379.] On August 13, 2008, Plaintiff was seen for an urgent follow up, reporting severe

---

[7]Plaintiff's treatment by Dr. Loudermilk is discussed below.

pain on the right side of the upper neck and radiating headache emanating from that area.
[R. 381.] A MRI revealed a small microadenoma within the left pituitary gland. [*Id.*] On examination, Plaintiff was tender over the right C6 paraspinal and had right-sided C6 paraspinal pain with myospasm. [*Id.*] Plaintiff requested another follow up in September 2008 for neck, low back, and left thigh pain, as well as pain in the left side of the trapezius. [R. 382.] On examination, Plaintiff had active trigger points in the left C5 paraspinal, trapezius, and L5 paraspinal regions, for which he received injections. [*Id.*]

On October 7, 2008, Dr. Baxley noted Plaintiff's neck and back pain was ongoing, and examination revealed limited left-sided neck rotation, limited back flexion and rotation because of pain, and diffuse trigger points and myospasms. [R. 384.] Dr. Baxley also noted,

> It is still my opinion that this patient [is] legitimately affected and unable to engage in gainful employment. He is going to require ongoing medications with subsequent[] side effects such as sedation and decreased cognition. He is likely to have ongoing pain in the future and will require medications[,] intermittent pain injections[,] and intermittent and frequent trials of physical therapy.

[R. 385.]

In a Functional Capacities Questionaire completed by Dr. Baxley on October 20, 2008, he indicated he expected Plaintiff's condition to become progressively worse, noting Plaintiff's diagnosed conditions had not improved since their date of onset. [R. 421.] Dr. Baxley opined the heaviest weight Plaintiff could lift or carry was fifteen pounds and that he should seldomly lift or carry that amount. [*Id.*] As to work restrictions, Dr. Baxley limited Plaintiff to standing two hours and sitting four hours and no climbing, squatting, or bending. [R. 421–22.] Dr. Baxley opined that Plaintiff's conditions would become more symptomatic

29

and his symptoms would flare up, resulting in absenteeism and an inability to engage in substantial gainful employment. [R. 422.] Dr. Baxley also opined that Plaintiff's conditions or symptoms would preclude him from working around heights and machinery because of his medications and drowsiness, but he would not be precluded from working in a noisy or crowded environment. [*Id.*] Dr. Baxley further opined Plaintiff's conditions or symptoms would require him to leave his assigned work station with little or no notice to his employer. [R. 422–23.] Dr. Baxley concluded that, in his professional medical opinion, Plaintiff was unable to engage in substantial gainful employment and had been unable to do so since March 2003. [R. 423.] Dr. Baxley also indicated that Plaintiff's condition had worsened since Dr. Baxley had completed questionnaires in February and March 2005. [*Id.*] Dr. Baxley also completed another clinical assessment of pain form, giving identical responses to his March 2005 responses, except he indicated that, with respect to Plaintiff's long-term prospect for recovery in terms of his level of pain, little improvement was likely and his pain was likely to increase with time. [R. 424–25.]

### Dr. Loudermilk's Treatment and Opinions

On June 12, 2007, Plaintiff presented to Dr. Eric Loudermilk for pain management on referral by Dr. Baxley. [R. 400.] On examination, Plaintiff exhibited pain with respect to his cervical spine and lower back, and there was tenderness in several areas of Plaintiff's cervical and lumbar regions. [R. 401.] Dr. Loudermilk assessed Plaintiff with (1) mechanical left-sided neck pain most likely due to left cervical facet arthropathy; (2) possible cervical disk protrusions or degenerative disk disease with left upper extremity radioculopathy; (3) possible carpal tunnel syndrome; and (4) low back pain with left lower extremity radioculpathy of unclear etiology. [R. 402.] Dr. Loudermilk scheduled a MRI to

30

"help shed some light on the source of [Plaintiff's] symptoms" [*id.*], and Plaintiff received two sets of left cervical facet joint injections [R. 392–99].   On August 15, 2007, Dr. Loudermilk noted Plaintiff continued to have pain in his lower back and left leg, and Dr. Loudermilk adjusted Plaintiff's medications and fitted Plaintiff for a TENS unit to use on his lower back and neck.  [R. 404.]  With the benefit of new MRIs [R. 388–91], Dr. Loudermilk assessed Plaintiff with (1) severe mechanical left-sided neck pain secondary to left cervical facet arthropathy, which had improved following the left cervical facet joint injections; (2) cervical spondylosis with chronic neck and left arm pain; (3) low back pain with left lower extremity discomfort due to multi-level lumbar disk bugling and degenerative disk disease; and (4) lumbar spondylosis [R. 404].

In September 2009, Dr. Loudermilk opined that Plaintiff's pain was "very suggestive of sciatica or radiculopathy" and suspected that Plaintiff may have nerve injury from his accident.  [R. 608.]  Dr. Loudermilk noted that Plaintiff had been receiving routine Cortisone injections in his lower back by Dr. Baxley that provided only short-term benefit.   [*Id.*] Plaintiff received several injections from Dr. Loudermilk [R. 609–11], and after a trial with a spinal cord stimulator that provided "excellent pain relief in his lower back and left leg," Plaintiff decided to proceed with a permanent spinal cord stimulator implant [R. 612–13]. On December 4, 2009, Dr. Loudermilk implanted the spinal cord stimulator [R. 614–15], and by March 2010, after some adjustments, Plaintiff was "very pleased with the results of his implant" [R. 616–18].

On April 20, 2010, Dr. Loudermilk completed a Functional Capacities Questionaire in which he opined Plaintiff would be limited to lifting/carrying 30 to 40 pounds occasionally, standing two hours, sitting four to six hours, no climbing ladders, climbing stairs for less

31

than one hour, squatting two hours, and bending less than one hour.  [R. 619–20.]  Dr. Loudermilk opined that he expected Plaintiff's symptoms would flare up from time to time, and Plaintiff would not be able to engage in substantial gainful employment during those times.   [R. 620.]   Dr. Loudermilk also opined Plaintiff's symptoms would lead to absenteeism and leaving the work station with little or no notice, and Plaintiff's conditions or symptoms precluded him from working around heights and machinery but not in noisy or crowded environments.   [R. 620–21.]   In his professional opinion, Dr. Loudermilk concluded that Plaintiff was unable to engage in substantial gainful employment.  [R. 621.]

Dr. Loudermilk also completed a Clinical Assessment of Pain form in April 2010, indicating that

1.    Plaintiff's pain is present to such an extent as to be distracting to adequate performance of daily activities or work;

2.    Physical activities such as walking, standing, bending, stooping, moving of extremities, etc., will greatly increase Plaintiff's pain to such a degree as to cause distraction from the task or even total abandonment of the task;

3.    Some side effects can be expected from Plaintiff's prescribed medications but will be only mildly troublesome;

4.    In his best judgment, pain and/or drug side effects can be expected to be severe and to limit Plaintiff's effectiveness due to distraction, inattentiveness, drowsiness, etc.;

5.    Although the level of Plaintiff's pain may be less intense or less frequent in the future, it will still remain a significant element in his life.

[R. 622–23.]  Dr. Loudermilk indicated that, while the nerve stimulator had helped Plaintiff, Plaintiff's low back pain and neck pain is not covered by his implant, and without the stimulator, his pain is markedly worse.  [R. 623.]  Dr. Loudermilk further opined that Plaintiff

"still requires pain medication and I do not feel he can maintain a status of gainful employment." [*Id.*]

Treatment notes from May 2010 through October 2010 show that, although the spinal cord stimulator had helped, Dr. Loudermilk continued to treat Plaintiff with medications and injections because Plaintiff continued to experience some pain. [R. 624–28.]

### Other Medical Evidence

On January 13, 2005, Dr. David Price prepared a report detailing his neuropsychological evaluation of Plaintiff; the evaluation included two days of interviews with and testing of Plaintiff. [R. 240–84.] Dr. Price based his evaluation on background information, behavioral observations, a clinical interview, psychological testing, and a review of Plaintiff's medical records. [R. 240.] Dr. Price concluded there was little objective evidence of any brain injury related to Plaintiff's March 2003 accident, but rather, Plaintiff's cognitive conditions appeared to be related to a pre-existing learning disability and borderline IQ. [R. 283.] Dr. Price noted there was some inconsistency reported in Plaintiff's motivation for completing tests,[8] which would be a concern on further neuropsychological testing, but Dr. Price also noted Plaintiff's borderline intellect could be confirmed through a review of his school records or the administration of a standard intellectual measure. [R. 284.] Additionally, Dr. Price concluded Plaintiff likely has

a Pain Disorder related to both a General Medical Condition
and Psychological Factors (DSM-IV-TR 307.89). His MMPI-2

---

[8] Specifically, Plaintiff's nonverbal subtest was invalid with irrelevant responses, but Plaintiff's verbal subtest was valid with compliant responses; Dr. Price did not provide a definitive explanation for these results. [*See* R. 278–80.]

> would suggest that those psychological factors would indicate that he has some psychosomatic reactivity when under stress. This likely contributes to his "invalidism." Pain appears to be his primary symptom, complaint, and deficit. It is the pain that appears to be contributing to his headaches, perceived disability, perceived memory complaints and alleged cognitive complaints. This should continue to be the focus of his treatment.

[R. 284.]

In June 2005, Plaintiff underwent a functional capacity evaluation ("FCE") by Tracy Rogers, RPT. [R. 294–95.] Ms. Rogers determined Plaintiff

> was capable of lifting 25 lbs from knuckle to shoulder level. The patient was unable to lift overhead or to the floor. The patient demonstrated the ability to push and pull a maximum force of 20 lbs and carry a maximum of 15 lbs in both hands, 15 lbs in the right hand and 7lbs in the left hand.

[R. 294.] Inclinometry measurements indicated an 18% range of motion ("ROM") deficit.

[*Id.*] Isometric strength testing showed Plaintiff was

> capable of lifting on an occasional basis 21 lbs, frequent basis 14 lbs, and constant 9 lbs. The patient demonstrated a 60% strength deficit. The isometric lifting is compatible with the patient's dynamic lifting; however, this is not based on a waist to floor lift. Strength and ROM testing of the upper extremity revealed no deficits. Strength and ROM testing of the right lower extremity revealed no deficits. The left lower extremity demonstrated a 25% strength deficit but normal ROM.

[*Id.*] In the "Non Material Handling" section, Ms. Rogers indicated Plaintiff was capable of constant kneeling, crawling, overhead activity, and manual dexterity and foot control; frequent standing and sitting; and occasional climbing, squatting, ambulation, bending, and balance. [R. 295.]

On January 3, 2006, Dr. William O. Crosby, a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment form. [R. 334–41.] Dr.

34

Crosby found Plaintiff was capable of lifting 50 pounds occasionally, 25 pounds frequently; standing, walking, and sitting six hours in an eight-hour work day; and unlimited pushing and/or pulling.  [R. 335.]  Dr. Crosby also found Plaintiff could occasionally able to climb ramps/stairs but never ladders/ropes/scaffolds and could frequently balance, stoop, kneel, crouch, and crawl.  [R. 336.]  Dr. Crosby noted that, due to asthma, Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.  [R. 338.]  Dr. Crosby opined Plaintiff's reported symptoms were attributable to a medically determinable impairment but that the severity or duration of the symptoms was disproportionate to the expected severity or duration.  [R. 339.]  Dr. Crosby noted that the "subjective s&i appear out of proportion to objective findings."  [*Id.*]  Dr. Crosby questioned the validity of the June 2005 functional capacity evaluation and noted that the objective evidence supported medium work.  [R. 340.]

In May 2006, Dr. George Chandler, a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment form.  [R. 349–56.]  Dr. Chandler found Plaintiff was capable of lifting/carrying 50 pounds occasionally and 25 pounds frequently; standing, walking, and sitting six hours in an eight-hour work day; and unlimited pushing and pulling.  [R. 350.]  Dr. Chandler also found Plaintiff was capable of frequently climbing ramps, stairs, ladders, ropes, and scaffolds and frequently balancing, stooping, kneeling, crouching, and crawling.  [R. 351.]  Dr. Chandler indicated no manipulative, visual, communicative, or environmental limitations were established.  [R. 352–53.]

In July 2006, Dr. Xanthia Harkness, a state agency medical consultant, completed a Psychiatric Review Technique form.  [R. 359–72.]  Dr. Harkness considered Listings 12.02, organic mental disorders; 12.05, mental retardation; and 12.07, somatoform

35

disorders and determined Plaintiff's impairments did not satisfy the diagnostic criteria of these listings and an RFC assessment was necessary.  [R. 359, 360, 363, 365.]  Dr. Harkness also found Plaintiff had mild restrictions in activities of daily living and social functioning; moderate limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation.  [R. 369.]  Dr. Harkness opined, "Overall the claimant has severe mental impairment that would not preclude simple, unskilled work.  Allegations appear credible."  [R. 371.]

Dr. Harkness also completed a Mental Residual Functional Capacity Assessment form in July 2006.  [R. 373–76.]  Dr. Harkness indicated Plaintiff was not significantly limited in most areas but was moderately limited in his ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; and (3) maintain attention and concentration for extended periods of time.  [R. 373–74.]  Dr. Harkness concluded Plaintiff had the following abilities:

> He is able to remember location and work-like procedures.  He is able to understand and remember short and simple instructions.  He could not understand and remember detailed instructions.
>
> He is able to carry out very short and simple instructions, but could not carry out detailed instructions.  He is able to attend to and perform simple tasks without special supervision for at least 2-hour periods.  He is able to understand normal work-hour requirements and be prompt within reasonable limits.  He is able to work in proximity to others without being unduly distracted.  He retains the ability to make simple work-related decisions. His symptoms would not interfere with satisfactory completion of a normal workday/week or require an unreasonable number of rest or cooling off periods.
>
> He has the capacity to ask simple questions and request assistance from peers or supervisors.  He can maintain some interaction with the public.  He is able to sustain appropriate

36

interaction with peers and co-workers without interference in work. He is able to sustain socially appropriate work behavior, standards, and appearance.

He would respond appropriately to changes in a routine setting. He has the ability to be aware of personal safety and avoid work hazards. Mental status evidence and [activities of daily living] indicate the ability to perform simple, unskilled work.

[R. 375.]

## APPLICATION AND ANALYSIS

### Plaintiff's Credibility

As stated, Plaintiff contends the ALJ improperly required Plaintiff to corroborate his subjective complaints of pain with objective medical evidence. [Doc. 23 at 6.] Plaintiff argues the ALJ cherry-picked medical evidence to come up with reasons to find Plaintiff was not credible, and the ALJ improperly supported his decision with the opinions of non-examining and non-treating physicians and a functional capacity evaluation completed at the request of Plaintiff's former employer's Workers' Compensation insurance carrier. [*Id.* at 7–9, 13.]

Whenever a claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. SSR 96-7p, 61 Fed. Reg. at 34,485. The credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to

the individual's statements and the reasons for that weight." *Id.*; *see also Hammond*, 765 F.2d at 426 (stating that the ALJ's credibility determination "must refer specifically to the evidence informing the ALJ's conclusions"). In evaluating the intensity and persistence of the claimant's pain, the ALJ should consider evidence other than the claimant's complaints, including (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the pain; (5) treatment, other than medication, the claimant receives or has received for relief of the pain; (6) any measures the claimant uses or has used to relieve the pain; and (7) any other factors concerning the claimant's functional limitations and restrictions due to the pain. 20 C.F.R. § 404.1529(c)(3). Moreover, to "determin[e] the extent to which . . . symptoms, such as pain, affect [the Plaintiff's] capacity to perform basic work activities," the ALJ is to "consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence," which includes medical and other evidence. *Id.* § 404.1529(c)(4); *see also, e.g.*, *Craig*, 76 F.3d at 595 ("Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.").

Here, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements

38

concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." [R. 471.] After this statement, the ALJ discussed how Plaintiff's back, lower extremity, and neck problems, as well as his asthma, informed the ALJ's decision to limit Plaintiff to medium work with significant postural and environmental restrictions. [R. 471–72.] Next, the ALJ discussed how Plaintiff's problems with memory and concentration and his cognitive deficits informed the ALJ's decision to limit Plaintiff to performing simple tasks in a stable, routine setting with occasional interaction with the public. [R. 472–73.] Then the ALJ indicated that he included no limitations based on Plaintiff's alleged headaches because they were non-severe [R. 473]; the ALJ determined Plaintiff's headaches were a non-severe impairment because he did not receive emergent treatment for headaches, his headaches were improved with medication, a head CT scan was normal, and Drs. Chandler and Crosby, who provided opinions as state agency medical consultants, found Plaintiff's headaches were not severe [R. 468–69]. Finally, the ALJ opined,

> Additional evidence weighs against the credibility of claimant's allegations and supports my residual functional capacity finding. During the FCE, claimant's lumbar spine range of motion results were inconsistent with straight leg raise test results. This suggests possible exaggeration. In addition, Dr. Price reported claimant was noncompliant on verbal parts of testing. This also suggests possible exaggeration. Moreover, despite claimant's allegations of extreme pain, claimant sat calmly during the hearing and gave responsive testimony. Similarly, though claimant reported pain at a 10 of 10 to Dr. Kopera, Dr. Kopera reported claimant "[did] not appear to be in this degree of pain". This again suggests possible exaggeration. Lastly, as described above, physical examinations produced variant findings. Such would not be

39

> > expected of someone with persistently disabling medical problems.

[R. 473 (internal citations omitted).]

A review of the ALJ's decision demonstrates he failed to discuss and explain the factors contained in 20 C.F.R. § 404.1529(c)(3) for evaluating subjective complaints of pain and how they weigh for or against finding Plaintiff's pain complaints credible.  Rather, in the one paragraph where he discussed Plaintiff's pain, the ALJ discounted Plaintiff's pain complaints based on evidence that "suggest[ed] possible exaggeration"; however, no doctors ever suggested any malingering or exaggeration by Plaintiff.  As noted above, Dr. Price found Plaintiff's results on the nonverbal portions of the testing Dr. Price administered were invalid and that Plaintiff gave irrelevant responses, but Dr. Price could not say why Plaintiff's results were invalid and irrelevant.   [R. 278–80.]   That is, Dr. Price never definitively stated that, out of the possible reasons for Plaintiff's noncompliance on the nonverbal portions, Plaintiff was exaggerating.[9]   Further, after Dr. Kopera noted that,

---

[9]Specifically, Dr. Price stated,

> > [T]here are conflicting indications regarding this individual's response style. His performance on the Verbal subtest was classified as Compl[ia]nt.  His Performance Curve characteristics indicate[] that he intended to do well and applied sustained effort for at least some of the items.  It is conceivable that he would have performed even better if he had tried harder.

> > However, his performance on the Nonverbal subtest was classified as Irrelevant.  His Performance Curve characteristics indicate that he did not respond with any relevance to the content of the test items.  Given that his performance on the Verbal subtest appears to be compliant, this is an unusual finding. Some possible explanations include fatigue, lack of interest in the Nonverbal subtest, sever[e] incapacitation in reasoning ability with no comparable incapacitation in word knowledge, or a desire to appear impaired on tests that evaluate reasoning capacity. . . .

[R. 280.]  Additionally, as noted, Dr. Price opined Plaintiff's pain appeared to be the root of all of Plaintiff's alleged problems but did not suggest that Plaintiff was exaggerating his pain complaints.  [R. 284.]

outwardly, Plaintiff did not appear to be in pain at the level of 10 on a scale of 0 to 10, Dr. Kopera found Plaintiff experienced discomfort upon palpation in several areas and some testing during the physical examination was limited because of Plaintiff's pain. [R. 297.] Finally, the ALJ noted that Plaintiff sat calmly during the hearing and gave responsive testimony [R. 473], but the Court would note that, at the time of the May 2011 hearing, Plaintiff had received a spinal cord stimulator implant, which he reported had helped his pain [*see, e.g.*, R. 618].[10]  Thus, the ALJ inaccurately summarized or drew questionable conclusions from the evidence he cited to support discounting Plaintiff's pain complaints.

The ALJ's original decision was remanded in part for a "full and fair evaluation" of Plaintiff's credibility, and the order remanding the case explained the applicable law and how the ALJ's decision was deficient. [R. 495–99.] Further, in the decision now before the Court, the ALJ explained the correct legal standard for evaluating subjective complaints of pain, explaining the two-step process for evaluating a claimant's symptoms. [R. 471.] The ALJ, therefore, clearly understood the correct legal lens through which to view Plaintiff's subjective complaints of pain; however, he failed to analyze Plaintiff's complaints under the Administration's regulations and controlling case law.  Moreover, as discussed, once examined in context, the evidence cited by the ALJ in his credibility finding does not support discrediting Plaintiff's pain complaints.  Accordingly, the Court is unable to find that the ALJ's credibility determination is supported by substantial evidence.

---

[10] The Court also notes Dr. Loudermilk apparently found Plaintiff's pain complaints credible enough to implant the spinal cord stimulator to control Plaintiff's pain, and prior to the stimulator, Dr. Loudermilk provided Plaintiff a TENS unit to relieve his neck and lower back pain.  [R. 404, 614–15.]

**Weight Assigned to the Treating Physician Opinions**

Plaintiff argues the ALJ improperly evaluated the opinions of Plaintiff's primary treating physicians—neurologist Dr. G. Timothy Baxley and pain management specialists Dr. Robert G. Schwartz and Dr. Eric Loudermilk. [Doc. 23 at 9–13; *see also* Doc. 26 (Plaintiff's reply brief).] Specifically, Plaintiff contends the ALJ improperly discounted these treating physician opinions because they were based on Plaintiff's subjective complaints. [*See* Doc. 23 at 9–11, 13, 16–17; Doc. 26.]

The responsibility for weighing evidence falls on the Commissioner or the ALJ, not the reviewing court. *See Craig*, 76 F.3d at 589; *Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 520. The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). ALJs typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* (quoting *Mastro*, 270 F.3d at 178). While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based on the factors listed in 20 C.F.R. § 404.1527(c).

Additionally, Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

1996 WL 374188, at *4 (July 2, 1996).  However, not every opinion offered by a treating source is entitled to deference:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions.  In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work.  Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner.  Such opinions on these issues must not be disregarded.  However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(e) (stating an ALJ does not have to "give any special significance to the source of an opinion on issues reserved to the Commissioner," such as an opinion that the claimant is disabled, the claimant's impairments meet or equal a listing, or the claimant has a certain RFC).

### *The ALJ's Assessment of the Medical Opinions*

Upon review of the medical evidence, the ALJ found Plaintiff had the following severe impairments: disorders of the spine, cognitive disorder, asthma, and learning disability.  [R. 463.]  The ALJ then determined Plaintiff retained the RFC to perform a wide

range of medium work.  [R. 470.]  In making this finding, the ALJ gave the greatest weight

to the assessment of Dr. Crosby, a non-examining, non-treating agency consultant, and

some weight to the assessment of Dr. Chandler, also a non-examining, non-treating

agency consultant.  [R. 473.]  The ALJ explained that

> these doctors were able to review evidence from varied
> sources and have substantial experience applying Social
> Security disability law and policy.  In addition, Dr. Chandler and
> Dr. Crosby adequately explained their findings, and Dr.
> Crosby's assessment is generally consistent with the record as
> summarized and analyzed above.  I give greater weight to Dr.
> Crosby's assessment because I find claimant's decreased
> spinal motion and positive straight leg raising tests warrant
> greater postural restrictions than Dr. Chandler assessed, and
> claimant's history of respiratory problems warrants restriction
> in exposure to respiratory irritants.  I note that Dr. Crosby did
> not review subsequent electromyography or diagnostic spinal
> imaging; however, his assessment was based on objective
> physical examination findings regardless of the cause thereof.

[*Id.*]

The ALJ gave some weight to the June 2005 FCE findings of Tracy Rogers because

Ms. Rogers's assessment was based on Plaintiff's actual observed abilities, and her

assessment of Plaintiff's ability to sit and stand were consistent with the record.  [R. 473.]

The ALJ declined to adopt Ms. Rogers's opinion that Plaintiff was unable to lift overhead

and was only able to lift 21 pounds on an occasional basis because Plaintiff had no severe

upper extremity impairment, MRIs of the cervical spine showed only mild abnormalities,

and Plaintiff had normal strength on examination.  [*Id.*]  The ALJ also noted inconsistencies

within Ms. Rogers's opinion and declined to adopt her conclusions that were inconsistent

with normal spine and joint range of motion findings, negative straight leg raises, normal

heel to toe walking, and objective determinations of lower extremity abnormalities.  [R.

474.]  The ALJ also gave some weight to the mental capacity assessments of Dr. Harkness, a non-examining, non-treating agency medical consultant, because she was able to review most all pertinent evidence of record, she has substantial experience applying Social Security disability law and policy, and her opinion was adequately explained.  [*Id.*]

The ALJ gave little weight to the opinions of Dr. Baxley, one of Plaintiff's treating physicians:

> I give little weight to Dr. Baxley's opinions from August 2004 that claimant should avoid repetitive lifting, avoid high impact activities, and not "engage in employment where he is required to use advanced cognitive skills".  The FCE demonstrated claimant could perform repetitive lifting, and examinations generally showed normal strength.  In addition, it is unclear what Dr. Baxley specifically meant in referring to high impact activities and activities requiring "advanced cognitive skills."  I have limited claimant to simple tasks giving cognitive problems demonstrated by testing and objective examination, though I note claimant was able to sit calmly during the hearing and provide responsive testimony, claimant had no problems concentrating during a teleclaim, Dr. Kopera observed no cognitive difficulties, and Dr. Price reported claimant demonstrated good effort on all tasks during testing and had satisfactory concentration and attention.
>
> I have further given little weight to Dr. Baxley's opinions from February 2005 that claimant should not drive due to posttraumatic headaches and should not lift over 10 pounds due to back pain.  Claimant's headaches are not a severe impairment for the reasons described under Finding 3.  Also, the FCE demonstrated claimant could lift 21 pounds occasionally, examinations generally showed normal strength, claimant has no severe upper extremity impairment, Dr. Schwartz assessed only an 8% spinal impairment, and Dr. Kopera assessed a 5% spinal impairment.
>
> I have further [given] little weight to Dr. Baxley's opinions from March 2005.  Therein, Dr. Baxley reported claimant's pain would not cause serious problems in claimant's ability to

perform his past work, but that claimant would experience "[g]reatly increased" pain with any exertional or postural activity such that he may be distracted or abandon the task altogether. These assessments appear inconsistent and the form Dr. Baxley completed contained no explanation whatsoever.  In addition, because this assessment was based on claimant's pain, such was likely highly influenced by claimant's subjective reporting of symptoms.  However, for the reasons described above, there are good reasons for questioning the reliability of claimant's subjective complaints.  Moreover, Dr. Kopera assessed only a 5% impairment of the spine, and Dr. Schwartz assessed only an 8% impairment of the spine.

I have also given little weight to Dr. Baxley's assessment from 2008.  Dr. Baxley ostensibly based this assessment in part on claimant's headaches.  However, such is not a severe impairment for the reasons described under Finding 3.  Also, though Dr. Baxley assessed claimant could lift 15 pounds seldomly, the FCE showed claimant could lift 21 pounds occasionally, claimant has no severe upper extremity impairment, and examinations generally demonstrated normal strength.  In addition, though Dr. Baxley assessed claimant could only stand for 2 hours a day and sit for 4 hours a day, the FCE indicated claimant could frequently sit and stand, examinations showed normal heel and toe walking, Dr. Kopera encouraged claimant to walk more in order to improve his condition, and claimant was able to sit calmly during the hearing.  Furthermore, though Dr. Baxley assessed claimant could never squat, climb, or bend, the FCE indicated claimant could occasionally climb, squat, and bend, Dr. Agha reported normal musculoskeletal ranges of motion, multiple examinations showed normal straight leg raising, and Dr. Baxley reported no postural restrictions in August 2004. Moreover, surgery was not recommended for claimant and claimant's spinal MRIs revealed only mild abnormalities.  Such would not be expected of someone as limited as Dr. Baxley assessed.

[R. 474–75 (internal citations omitted).]

The ALJ gave some weight to the opinions Dr. Loudermilk, one of Plaintiff's treating

physicians, expressed in his April 2010 responses to a functional capacities questionnaire.

[R. 475.] Specifically, the ALJ found the following portions of Dr. Loudermilk's opinion were

46

consistent with the record: Plaintiff could lift or carry up to 40 pounds, sit up to six hours a day, and squat for two hours a day[11]; and Plaintiff could not climb ladders.  [*Id*.]  In addition to disagreeing with some of Dr. Loudermilk's postural limitations [*id*.], the ALJ disagreed with the following:

> Seventh, Dr. Loudermilk reported claimant's condition may lead to work absences.  However, this is a patently uncertain assessment, which does not quantify the number of absences or offer an empirical justification.  Eighth, Dr. Loudermilk assessed claimant may have to take breaks from work if his pain flares.  This is patently uncertain, and is inconsistent with Dr. Loudermilk's assessment that claimant could stand 2 hours a day and sit up to 6 hours a day.  Ninth, Dr. Loudermilk opined claimant could not "engage in substantial, gainful employment."  A claimant's ability to perform substantial gainful activity is an issue reserved to the Commissioner of Social Security and treating opinions thereon are not entitled to special significance (SSR 96-5p).  Moreover, even if the restrictions Dr. Loudermilk assessed were accepted, it is not clear there would be no work at all claimant could perform.

[R. 476.]  The ALJ also disagreed with Dr. Loudermilk's assessment of Plaintiff's pain because it was inconsistent with substantial evidence of record:

> Though Dr. Loudermilk essentially opined claimant could not sufficiently persist in performing work activity due to pain, Dr. Loudermilk reported in his other assessment claimant could sit up to 6 hours a day and stand for 2 hours a day, which accommodates a 40-hour a week work schedule.  In addition, in this same assessment, Dr. Loudermilk reported claimant's spinal stimulator markedly improved his pain.  Moreover, claimant was able to sit calmly during the hearing and provide responsive testimony, claimant had no problems concentrating during a teleclaim, and Dr. Price reported claimant demonstrated good effort on all tasks during testing and had satisfactory concentration and attention.  In addition, because this assessment was based on claimant's pain, such was likely

---

[11]The ALJ also noted that some findings suggested Plaintiff could squat for more than two hours a day. [R. 475.]

47

> highly influenced by claimant's subjective reporting of
> symptoms.

[*Id.* (internal citations omitted).]

The ALJ also gave some weight to the October 2003 assessment of Dr. Kopera, one of Plaintiff's treating physicians, who opined Plaintiff could "resume his regular activities" but should not lift more than 50 pounds due to his lumbar spine problems.  [*Id.*]  The ALJ found this assessment was consistent with Plaintiff's spinal MRIs and generally normal strength demonstrated by objective examinations.  [*Id.*]  The ALJ gave little weight, however, to Dr. Kopera's assessment from August 2003 that Plaintiff should lift no more than ten pounds and alternate between sitting and standing because these appeared to be short term restrictions.  [*Id.*]

Further, the ALJ gave little weight to the January 2005 opinion of Dr. Schwartz, another of Plaintiff's treating physicians, that Plaintiff should not lift over ten pounds and should not drive for prolonged periods.  [*Id.*]  The ALJ discounted this assessment because it was based on Plaintiff's headaches, which were not severe, and other objective findings demonstrated Plaintiff was not so limited in the amount he could lift.  [R. 476–77.]  The ALJ also gave little weight to Dr. Schwartz's March 2005 assessment that Plaintiff's pain would distract him from adequate work performance because the assessment was inconsistent with substantial evidence of record.  [R. 477.]  Specifically, the ALJ noted,

> Claimant was able to sit calmly during the hearing and provide
> responsive testimony, claimant had no problems concentrating
> during a teleclaim, and Dr. Price reported claimant
> demonstrated good effort on all tasks during testing and had
> satisfactory concentration and attention.  In addition, because
> this assessment was based on claimant's pain, such was likely
> highly influenced by claimant's subjective reporting of
> symptoms.  However, for the reasons described above, there

48

> are good reasons for questioning the reliability of claimant's subjective complaints.  Also, Dr. Schwartz only reported an 8% impairment of claimant's lumbar spine, and Dr. Kopera assessed only a 5% impairment of the lumbar spine.

[*Id.*][12]

### Analysis

The ALJ appears to afford little weight to the treating physician opinions regarding Plaintiff's functional abilities because they were largely based on Plaintiff's subjective complaints of pain.  [*See, e.g.*, R. 475 (giving little weight to Dr. Baxley's March 2005 opinion because his assessment was based on Plaintiff's pain and, therefore, likely heavily influenced by Plaintiff's subjective complaints, which the ALJ found were of questionable reliability), 476 (giving little weight to Dr. Loudermilk's second April 2010 assessment because it was based on Plaintiff's questionable pain complaints), 477 (giving little weight to Dr. Schwartz's March 2005 assessment because it was based on Plaintiff's questionable pain complaints).]  As discussed above, the ALJ's evaluation of Plaintiff's credibility with respect to his pain complaints is not consistent with applicable law and is not supported by substantial evidence.   Therefore, the ALJ's decision to discount Plaintiff's treating physicians' opinions because he found Plaintiff's pain complaints were not fully credible cannot be supported by substantial evidence.

---

[12]The ALJ gave no weight to vocational evaluations by Karl Weldon and Glen Adams because they were based on work restrictions given by Plaintiff's treating physicians and not the ALJ's RFC.  [R. 477.]  In September 2005, Mr. Weldon opined, "The Clinical Assessment of Pain forms completed by both Drs. Baxley and Schwartz represent limitations that would prevent [Plaintiff] from performing any type of competitive employment at any exertional or skill level." [R. 147.]  In October 2005, Mr. Adams opined that, if the January 2005 opinion of Dr. Schwartz and the February 2005 opinion of Dr. Baxley represented their current opinions regarding Plaintiff's ability to work, Plaintiff would be unable to engage in any substantial gainful employment. [R. 149.]

Further, the ALJ failed to evaluate the treating physicians' opinions in accordance with 20 C.F.R. § 404.1527, which requires the ALJ to consider the following non-exclusive list of factors: (1) whether the physician has examined the claimant, (2) the treatment relationship between the physician and the claimant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist.  Specifically, while the ALJ outlined the medical evidence [R. 464–68] and the weight he assigned to the medical opinions [R. 473–77], he never explained why he discounted the treating physicians' treatment notes, and he never found the treating physicians' opinions were inconsistent with their treatment notes.  For example, the ALJ concluded Plaintiff's headaches were not a severe impairment[13] [R. 468–69] but failed to explain why he discounted Dr. Baxley's numerous assessments that Plaintiff suffered from posttraumatic headaches [*see, e.g.*, R. 407–16], even though, again without explanation, the ALJ discounted Dr. Baxley's responses to the February 2005 and October 2008 questionnaires because the responses were partly based on Plaintiff's headaches [R. 474, 475].  Moreover, the ALJ did not evaluate the consistency of the opinions regarding Plaintiff's pain with the record as a whole; as an example, the ALJ failed to explain why Drs. Schwartz and Baxley's opinions assessing Plaintiff's pain were inconsistent with other substantial evidence of record or why they were rejected.  Thus, the ALJ appears to have impermissibly picked and chosen the evidence that most closely suited his findings.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ("The

---

[13]The Court notes that, in his initial decision, the ALJ determined Plaintiff's headaches were a severe impairment.  [R. 15.]  The ALJ offered no explanation as to why he changed his finding regarding Plaintiff's headaches in his second decision.

ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."); *see also Seabolt v. Barnhart*, 481 F. Supp. 2d 538, 548 (D.S.C. 2007) ("The ALJ is not required to discuss every piece of evidence, but if he does not mention material evidence, the court cannot say his determination was supported by substantial evidence.").

Additionally, "the testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record." *Gordon*, 725 F.2d at 235 (citing *Martin v. Secretary*, 492 F.2d 905 (4th Cir. 1974)). Nevertheless, "the testimony of a non-examining physician can be relied upon when it is consistent with the record." *Id.* (citing *Kyle v. Cohen*, 449 F.2d 489, 492 (4th Cir. 1971)). In this case, the ALJ gave great weight to the opinion of Dr. Crosby and some weight to the opinion of Dr. Chandler, both non-examining and non-treating physicians, whose opinions were not based on the full record and appear to discount Plaintiff's pain complaints because they were not supported by objective medical findings. [*See* R. 335–36 (acknowledging Plaintiff had complained of pain since his accident), 339 (noting subjective symptoms appeared out of proportion with objective findings), 340 (noting the objective evidence supported finding Plaintiff was capable of medium work), 350 (noting normal findings on examination).] However, as discussed, objective evidence of pain is not required to substantiate a claimant's allegations regarding the effects of pain on the claimant's functional abilities. *See, e.g.*, *Hines v. Barnhart*, 453 F.3d 559, 563–64 (4th Cir. 2006) (holding the ALJ erred by refusing to credit the claimant's allegations of debilitating pain because "a laundry list of objective indicators" was not included in the claimant's

treating physician's medical records); *Walker*, 889 F.2d at 49 ("[W]hile there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." (citation omitted)). For all of these reasons, the Court cannot conclude the ALJ's evaluation of the treating physician opinions is supported by substantial evidence.

**Remand for Award of Benefits**

Whether to remand for additional proceedings or for an award of benefits is generally approached on a practical level, and the decision rests within the sound discretion of the district court.  *Smith v. Astrue*, No. 3:10-66, 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011) (citing *Edwards v. Bowen*, 672 F. Supp. 230, 237 (E.D.N.C. 1987)). An award of benefits is more appropriate when further proceedings would serve no useful purpose.  *Kornock v. Harris*, 648 F.2d 525, 527 (9th Cir. 1985).  Likewise, an award of benefits is appropriate when substantial evidence indicates the claimant is disabled, and the weight of the evidence indicates a remand would only delay the receipt of benefits while serving no useful purpose or a substantial amount of time has already passed. *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984); *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982).  Further, an award of benefits is appropriate when the Commissioner has had an opportunity to develop the record on an outcome-determinative issue and has failed to produce substantial evidence, *Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983); *Tennant,* 682 F.2d at 710–11; *Edwards*, 672 F. Supp. at 237, or where "there is not the slightest uncertainty as to the outcome" and additional proceedings "would be an idle and useless formality," *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766

n.6 (1969); *see also Barry v. Bowen*, 862 F.2d 869, 1988 WL 124873, at *2 (4th Cir. 1988) (unpublished opinion) (citing *NLRB*, 394 U.S. at 766 n.6).  On the other hand, additional proceedings are appropriate where they could remedy defects. *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989).

The Court has reviewed the record and the parties' filings and finds reopening the record would serve no useful purpose. Plaintiff applied for benefits in October 2005, alleging an onset of disability date of March 20, 2003.  Because, on a different application, Plaintiff has been awarded benefits as of March 3, 2009, the issue in this case is whether Plaintiff was disabled between March 20, 2003 and March 2, 2009.  A substantial amount of time has passed since Plaintiff alleges he became disabled and since he applied for benefits, and this case has already been reversed and remanded for further administrative action; yet, the Court has found reversible error again. Further, as discussed in detail below, substantial evidence in the record as a whole indicates the ALJ should have credited Plaintiff's pain complaints, and hypothetical questions posed to the vocational expert containing the limitations imposed by Plaintiff's pain indicate no jobs were available to Plaintiff.  Accordingly, remand would only delay the receipt of benefits while serving no useful purpose because there is no additional information to be developed in the record to remedy any defects.   Therefore, in this case, an outright award of benefits is appropriate.

In addition to the evidence noted above, Plaintiff represented in a Daily Activities Questionnaire completed in 2006 that his daily activities were limited largely due to pain. [R. 202–05.]  For example, Plaintiff indicated he has problems preparing meals because of back pain; his eating habits have changed because he has nausea from the constant

back pain; he does only a little weekly housework because he does only what he can for as long as he can; someone else has to get gas and do heavy lifting for his household; he has to use a motorized wheel chair when grocery shopping; he can no longer engage in his hobbies of hunting, fishing, and camping because he cannot walk without hurting and is limited in his ability to sit, lift, walk, and stand; and he only drives when he has to because it puts pressure on his back. [R. 203–05.] Plaintiff also indicated that his impairments have affected his ability to get dressed. [R. 226.] At the May 17, 2011 hearing, Plaintiff testified that activities such as walking, standing, and sitting affect his pain level such that he can stand ten minutes and sit twenty minutes and is not supposed to bend, lift, or stoop at all. [R. 517.] Plaintiff testified he used a cane for four or five years because his leg would go numb and give out, and he fell several times. [R. 518.] Plaintiff also testified that the pain in his back, legs, and neck had not improved and that he still had regular headaches. [R. 518–19.] At the October 24, 2008 hearing, Plaintiff's wife testified that the accident affected Plaintiff's memory [R. 68–69]; Plaintiff gets really bad headaches and she has to put him in a dark, quiet room [R. 69–70]; he becomes disoriented [R. 68]; he is in constant pain with his back and neck, and his medication puts him to sleep right away [R. 71]; and he does not drive a lot because she does not trust him to drive too far [R. 74].

Further, as detailed above, Plaintiff's primary treating physicians, Drs. Baxley, Schwartz, and Loudermilk, consistently noted Plaintiff's complaints pain and evidence of pain on examination, and they attempted to treat Plaintiff's pain with medications and other treatments. [*See, e.g.*, R. 232–38, 318–33, 377–82, 392–404, 407–18, 608–18.] Plaintiff's treating physicians opined that Plaintiff's ability to work would be limited by the effects of

54

his pain and the side effects of his medications.  [*See, e.g.*, R. 292–93, 385, 422–25,

620–23.]  As noted, no physician ever opined that Plaintiff's pain complaints and symptoms

were not credible.

At the hearing, Plaintiff's attorney posed two hypotheticals to the vocational expert

incorporating the limitations imposed by Plaintiff's pain:

> Q       I'm referring to [Dr. Baxley's October 2008 questionnaire
> responses] now.  If you assume [Plaintiff's] age during the
> relevant period, his education and his past work experience,
> and assume that he has pain that is present to such an extent
> as to be distracting to the adequate performance of daily
> activities or work, what would be your opinion as to [Plaintiff's]
> employability?
>
> A       He'd be unable to perform duties.
>
> Q       Assuming that same hypothetical, if physical activities
> such as walking, standing, bending, stooping, and moving of
> extremities greatly increased his pain and the pain is likely to
> occur to such a degree as to cause distraction from the task or
> even total abandonment of the task, what would be your
> opinion as to his employability?
>
> A       Same response.  No work.

[Supp. R. 43–44.]  Accordingly, a remand for further findings would serve no useful

purpose because the record substantiates Plaintiff's allegations that his pain limits his

functional abilities, and a vocational expert has testified that limitations resulting from

Plaintiff's pain would eliminate all jobs in the economy.  Therefore, the Court recommends

this case be remanded for an award of benefits.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based on the foregoing, it is recommended that the decision of the

Commissioner be REVERSED and REMANDED for an award of benefits from Plaintiff's

alleged onset of disability date of March 20, 2003 through March 2, 2009, pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO RECOMMENDED.

United States Magistrate Judge

August 7, 2013
Greenville, South Carolina